NO.  94-343

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

BEULAH FARLEY, as an individual and
as power of attorney for others; and
ARMELLS LAND AND CATTLE CO., a Montana
corporation,

        Plaintiffs and Respondents,

   -v-

BOOTH BROTHERS LAND AND LIVESTOCK
COMPANY, a Colorado corporation, and
WESTERN ENERGY COMPANY, a Montana
corporation,

        Defendants and Appellants.

FILED

FEB 14 1995

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Sixteenth Judicial District,
                In and for the County of Rosebud,
                The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

       For Appellants:

          Scot Schermerhorn, Freeman & Schermerhorn, Billings,
          Montana

       For Respondents:

          Gary G. Broeder, Billings, Montana; R. Sam
          Oldenburg, Karowsky, Witwer, Miller & Oldenburg,
          Greeley, Colorado

Submitted on Briefs:  October 28, 1994

Decided:  February 14, 1995

Filed:

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Sixteenth Judicial District Court, Rosebud County, Memorandum and Opinion as well as Supplemental Memorandum and Opinion, concluding that Western Energy Company (Western) should be making its payments under the leases at issue, to Booth Brothers Land and Livestock Company (Booth). We affirm.

## ISSUES

The following are issues on appeal:

I.   IS scoria a mineral for the purposes of deciding the present action?

II. Is Farley entitled to the compensation payable by Western for the use of the surface?

## FACTUAL BACKGROUND

The parties have stipulated to an agreed statement of facts. The following is a summary of the pertinent facts from the agreed statement of facts.

"Booth Land and Livestock Company, a successor to Booth Brothers Land and Livestock Company (herein called "Booth") is the owner of ranch property located in Treasure, Big Horn and Rosebud Counties, Montana. The west part of the ranch, located principally in Treasure and Big Horn Counties, was purchased from the Federal Land Bank of Spokane on January 7, 1988, and the east part of the ranch, located principally in Rosebud County, was purchased from Armells Land and Cattle Company on October 12, 1988." Farley's Inc. and Armells Land and Cattle Company were the original surface owners of the properties at issue.

"The ranch is burdened with the rights of the owners of the coal deposits and their lessees to use and consume the surface for coal mining under three agreements. The agreements generally provide that Western Energy Company ("Western") has the right to use the surface of the land subject to the agreements for mining purposes and provides for compensation for such use."

The owner of the coal deposits, the owner of the property subject to the agreements and the lessee under the agreements are as follows:

1. The coal deposits are owned by Burlington Northern Railroad Company. Neither plaintiffs nor Booth own or have any interest in the coal deposits.

2. The surface of the property at issue is owned by Booth.

3. Western is the current tenant with the right to use the surface in connection with its mining of Burlington Northern's coal, under the Consolidation Coal Company Agreement (Consol Agreement), the Surface Lease and the Scoria Lease and holds all rights as a tenant thereunder and has all of the obligations of the tenant under such agreements

The central issue in the present action is to whom Western should be making payments under the leases associated with the property.

PROCEDURAL BACKGROUND

On June 20, 1990, Farley filed a complaint in the Sixteenth Judicial District Court, Rosebud County, seeking a declaratory judgment that they were to receive royalty payments from Western

3

for Western's use of the surface land. Western filed its answer on August 15, 1990, and Booth filed its answer and counterclaim on March 6, 1991. Booth, in its counterclaim, sought to have title quieted in the property at issue, except for the reservation of mineral rights and the payments under the Consol Agreement and to receive judgment with respect to the payments by Western for the use of the surface of the land. The parties stipulated that Western did not have to actively participate in the action because it is not affected, in any meaningful way, by the decision rendered here. It simply needs to know to whom to send the applicable payments.

The District Court issued an order, filed on July 16, 1993, concluding that "the right to the compensation for damage to surface rights contained in the leases regarding coal deposits passed with the fee to Booth Brothers, except for that which was expressly reserved by Farley." The court also issued a Supplemental Opinion, which was filed on May 11, 1994, stating that scoria was not a mineral for the purpose of this action. This appeal by Farley followed.

DISCUSSION

I.

Is scoria a mineral for the purpose of this action?

Farley states that scoria is located in "a relatively small portion of the United States [and], [i]n eastern Montana, northern Wyoming, and western North Dakota, [it] is used to construct roadways." Farley also asserts that scoria is used to manufacture

4

"mineral wool." It argues that because scoria has limited availability and has a use which is an alternative to its use in constructing roadways, it has an exceptional value above ordinary substances such as sand, clay and gravel, and therefore, should be defined as a mineral. Booth counters that "[t]he District Court correctly decided that 'scoria,' as that term is used in eastern Montana, is akin to gravel and, therefore, not a mineral for conveyancing purposes. Thus, judgment was properly granted to Booth on this issue on the grounds that the scoria rock and all rights under the Scoria Lease had passed to Booth as the subsequent surface owner." We agree with the District Court and Booth.

The term "mineral" has been the source of considerable confusion in mineral law litigation nationwide. As Miller Land & Mineral v. Highway Com'n (Wyo. 1988), 757 P.2d 1001, 1002, aptly states:

> The courts which have held that the general reservation of "all minerals" is inherently ambiguous have traveled over a long and tortuous path in a complex and hopeless search to discover the particular minerals the parties intended to reserve. The only reliable rule which surfaces from the confusing and inconsistent approaches taken by those courts attempting to ferret out the subjective intent of the parties is that the word "mineral" means what the court says it means. The result is title uncertainty and the need to litigate each general reservation of minerals to determine which minerals it encompasses. (Citations omitted.)

We take this opportunity to clarify, in the context of this case, whether scoria is a "mineral" for the purpose of land transfers in Montana.

At the outset, we are concerned here only with "scoria" that is also characterized as "roof-rock" and which results from burning

coal outcroppings. We are not concerned with, nor does our opinion cover scoria of the basaltic lava variety. Montana statutory law has previously defined the term "mineral" in specific contexts concerning mining regulation. Title 82 is entitled "Minerals, Oil and Gas" and is pertinent to our discussion in the instant case. Section 82-4-303(7), FICA, found under part 3, Metal Mine Reclamation, of Chapter 4, Reclamation, provides one definition for the term "mineral":

> "Mineral" means any ore, rock, or substance, other than oil, gas, bentonite, clay, coal, sand, gravel, phosphate rock, or uranium, taken from below the surface or from the surface of the earth for the purpose of milling, concentration, refinement, smelting, manufacturing, or other subsequent use or processing or for stockpiling for future use, refinement, or smelting.

Part 4 of Chapter 4, Reclamation, is entitled Opencut Mining Reclamation and it provides, under § 82-4-403(6), MCA, that:

> "Minerals" means bentonite, clay, scoria, phosphate rock, sand, or gravel.

It appears that these definitions of the term "mineral" are not necessarily consistent. In § 82-4-403(6), MCA, "gravel" is a mineral but in § 82-4-303(7), MCA, "gravel" does not come within the definition of the term "mineral." Scoria is included in the definition of "mineral" in § 82-4-403(6), MCA, but it is unclear whether it would be included under the definition of "mineral" in § 82-4-303(7), MCA. However, this apparent inconsistency can be clarified by recognizing that the definition of "mineral" can differ according to the context in which it is used. The definition of the term "mineral" in § 82-4-303(7), MCA, is applicable only with respect to the regulation of metal mine

6

**reclamation** and the term "mineral" as defined in § 82-4-403(6), MCA, applies only in the context of the regulation of opencut mining reclamation. Thus, the term "mineral," has varying definitions in different contexts.

The issue to be decided here is whether scoria is a "mineral" for the purpose of determining who should receive the payments from Western for the use of the surface of the land and the extraction of the scoria. This is an issue of first impression in Montana, and we therefore, consider case law from other jurisdictions which lead us to conclude that, for the purposes of land transfers, including exceptions and reservations, scoria is not a mineral.

In Hovden v. Lind (N.D. 1981), 301 N.W.2d 374, the Supreme Court of North Dakota, in deciding whether certain minerals had been reserved in a land sale contract, stated:

> Though the word "minerals" has varying definitions,...this court, prior to the enactment of § 47-10-25, held in Salzseider v. Brunsdale, 94 N.W.2d 502 (N.D.1959), that the term did not, in a reservation clause, include gravel. We believe this precedent applies to materials like clay and scoria also. A reasonable construction of the word "minerals" as used in a land sale contract excludes clay and scoria, as well as gravel....Furthermore, we concur in the notion that materials like gravel, clay and scoria are not ordinarily classified as minerals because they are not exceptionally rare and valuable. (Citation omitted.)

Hovden, 301 N.W.2d at 378. Holland v. Dolese Company (Okla. 1975), 540 P.2d 549, cited in Hovden, involved the question of whether limestone was part of the reserved mineral right at issue. The Holland court stated:

> " . . . substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in

7

character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitably be manufactured into cement. Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word. (Cases cited.) " (Emphasis added.)

Holland, 540 P.2d at 550-551, citing Heinatz v. Allen (Tex. 1949), 217 S.W.2d 994. The court went on to declare:

In the case at bar, the limestone being quarried was a general part of the soil and subsoil. That limestone had no peculiar property so as to be rare and exceptional in character. It was not an exceptional substance and is comparable to sand and gravel. The quarry operation destroyed the surface for its normal uses, such as cattle grazing. The limestone was not included in the reserved mineral right. To hold otherwise would negate much of the substance of the transaction with the Wards and their subsequent real estate trade with Dolese. . . It would destroy the general intent of enjoyment of the surface. The limestone is not part of the minerals, under the reserved mineral rights in the deeds here involved.

Holland, 540 P.2d at 551-552. Finally Miller also cited the above language from Heinatz, concluding that the appellees should have been granted the title to the gravel in, on and under the surface of the land at issue because the court held that "gravel" was not a mineral, and therefore had not been reserved. Miller, 757 P.2d at 1004.

The above precedent leads us to conclude that for the purpose of determining to which party payments should be made by Western, scoria is not a mineral. The District Court stated that scoria is used in road construction. Moreover, the appellant agrees that scoria is used to construct roadways. Booth appended a letter, dated August 19, 1993, to its supplemental brief of September 14, 1993, before the District Court from Contract Analyst Carol Matter

8

of Western Energy Company, which stated:

> We have found that the term "Scoria" is a local term used to refer to the baked roof rock (which is shale, sandstone and clay) that results when the coal outcropping burns. According to Walter T. Huang, author of the text Petrology, the technical definition of Scoria is "a term applied to basaltic lava, in which the gas vesicles are numerous and irregular in shape." The local term "Scoria" may have evolved due to the rock's reddish brown coloring often identified with basaltic rock.

The use of scoria in constructing roadways does not elevate scoria to the status of a compound which is "rare and exceptional in character" and therefore, a "mineral." Holland, 540 P.2d at 550-551. The appellants did make one argument that scoria had special properties which made it rare and exceptional. Appellants argued that an alternative use for scoria was in the manufacture of "mineral wool." Appellants contend that this use makes scoria more valuable than ordinary sand and gravel, which is used primarily for building and construction. However, this argument was raised for the first time on appeal and will not, therefore be addressed by this Court. Goodover v. Lindey's Inc. (1992), 255 Mont. 430, 441, 843 P.2d 765, 772.

Therefore, the only evidence presented to the District Court and considered by this Court is to the effect that local "scoria" is baked roof rock, composed of shale, sandstone and clay, and is used in road construction. "Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word." Holland, 540 P.2d at 550-551. We agree and hold that the District Court did not err in determining that scoria, for the

9

purposes of the present action, is not a mineral.

Because scoria is not a mineral for the purpose of the present action, the rights to the scoria benefits were not reserved in the mineral reservations in the leases. The scoria lease, and its resultant proceeds, passed with the land at its ultimate transfer to Booth. Booth, therefore, is entitled to the entire scoria lease proceeds. The District Court did not err in concluding that "[n]o specific reservation having been made, the rights to the scoria rock passed with the surface and the royalty payments with respect to the scoria lease passed to the Booth Brothers."

## II.

Is Farley entitled to the compensation payable by Western for the use of the surface?

Farley argues that the payments made by Western under the leases at issue are "royalty interests" and as such, are the personal property of Farley and did not pass to Booth upon its (Booth's) purchase of the surface rights to the lands in contention. Booth contends that the payments are akin to rent and are appurtenant to the land. Therefore, Booth asserts, the right to the payments passed to Booth because it was not specifically reserved by Farley in Farley's quitclaim or warranty deeds. In the quitclaim from Farley to Armells Land Company, however, Farley did specifically reserve one-half of all mineral interests. We agree with Booth that the payments made by Western, whether termed royalties or rents, are appurtenant to the land and passed to Booth upon conveyance of the surface interest in the lands at issue. We

10

also agree that Farley did specifically reserve one-half of all mineral interests in the *Armells* quitclaim and Farley is entitled to payments from that specific <u>reservation.</u>

In addressing the question of who should receive the rights to Western's payments, the District Court stated:

> Surface rights, because they are part and parcel of what most people understand as land ownership, should, as a matter of public policy, automatically pass, unless expressly excepted or reserved.

While this case does not involve oil and gas royalties, Williams and Meyers, <u>Oil and Gas Law</u>, at § 213.8, at 155-157, by analogy, supports the District Court's finding that the surface rights should pass to Booth and provides:

> Classification of an interest in oil and gas as realty or personalty has been considered significant when the issue in controversy is whether such interest passes by a conveyance, devise, or mortgage of "real estate." Thus, after the execution of a lease in which the lessor retains a royalty interest, when he conveys or mortgages the land without express mention of the reserved royalty interest under the lease, it may be contended that the royalty interest is not covered by the deed or mortgage. It is our view that the classification of the royalty interest as realty or as personalty is properly of no significance in this context; the question is simply whether the royalty interest, even though it may be viewed as personalty in the particular state, is viewed as appurtenant to the land.

Two ALR articles lend further support to the District Court's conclusion that the Western payments are appurtenant to the sale of the surface. These articles state:

> The cases clearly establish that the rights of a grantor, provided for under an existing lease, in royalty unaccrued, that is, royalty not due, at the time of a conveyance of the land, pass to the grantee. It likewise seems clear that a mortgage of the land will, at least upon divestiture of the mortgagor's general title by foreclosure, divest him of title to royalties unaccrued

11

at that time...."

94 A.L.R. 660.   Additionally,

> The later cases agree that a sale or mortgage of land which is subject to an oil and gas lease includes unaccrued royalty where the same is not specially reserved and is not excluded by a prior assignment....
> <u>Clearly a covenant to pay royalty is one which "touches and concerns" the land, and so may well be regarded as running with the land</u> and carrying unaccrued benefits to the purchaser of the land.   In this respect royalty may be likened to rent....   The doctrine is well settled that rent to accrue is incident to, and accompanies, the reversion, unless severed by express reservation....   (Citation omitted.)   (Emphasis added.)

140 A.L.R. 1280, 1280.   The issue in State v. Royal Mineral Ass'n (Minn. 1916), 156 N.W. 128, was whether payments made under certain mining leases were "credits" and as such taxable as personal property.   The <u>Royal Mineral</u> court held that the amount payable by the lessee under the leases, "a royalty of twenty-five cents per ton upon all ore mined...," was rent.   <u>Royal Mineral,</u> 156 N.W. at 129.   They were "the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows."   <u>Royal Mineral,</u> 156 N.W. at 129. (Citation omitted.) Further,

> "[u]naccrued rents are not personal property. They are incorporeal hereditaments.   They are an incident to the reversion and follow the land.   They pass with a sale or devise of the land... For what is the land but the profits thereof?   (Citations omitted.)

<u>Royal Mineral,</u> 156 N.W. at 129-130.   What, indeed is the land but the profits thereof?   It makes little sense for Booth to purchase the surface rights to the lands at issue, and not receive compensation for the destruction of that surface or the benefits of the ownership of the surface.   We conclude that the right to the

12

payments for the surface area destruction passed to Booth upon his purchase of the lands at issue. However, because Farley specifically reserved one-half of all mineral interests in the Farley-Armells quitclaim, it is entitled to one-half of the payments flowing from the interest retained as described in the Farley-Armells quit claim deed. We hold that the payments by Western for the use of the surface land should be made to Booth, the owner of the surface lands at issue.

AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

13

February 14, 1995

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Scot Schermerhom
FREEMAN & SCHERMERHORN, P.C.
401 N. 31ST, SUITE 710
P.O. Box 7176
Billings, MT 59103-7176

Gary G. Broeder, Esq.
Transwestern I, Ste. 219
404 No. 31st St.
Billings, MT 59101

R. Sam Oldenburg, Esq.
Karowsky, Witwer, Miller & Oldenburg
P.O. Box 1407
Greeley, CO 80532-1407

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy