FILED

05/20/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 19-0304

OP 19-0304

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 131

MARY ANN MURRAY and LIGE M. MURRAY,

      Plaintiffs, Counter-Defendants, and Appellees,

  v.

BEJ MINERALS, LLC, and RTWF LLC,

      Defendants, Counter-Claimants, and Appellants.

| | |
|---|---|
| ORIGINAL PROCEEDING: | Certified Question, United States Court of Appeals for the Ninth Circuit, Cause No. 16-35506<br>Chief Circuit Judge Sidney R. Thomas, and the Honorable Kim McLane Wardlaw, Marsha S. Berzon, Jay Bybee, Consuelo Callahan, Sandra Segal Ikuta, Mary H. Murguia, Morgan Christen, Paul J. Watford, Michelle Friedland, and Ryan D. Nelson, Presiding Circuit Judges |

COUNSEL OF RECORD:

    For Appellants:

        Eric B. Wolff (argued), Stephanie M. Regenold, Perkins Coie LLP, Seattle, Washington

    For Appellees:

        Harlan B. Krogh (argued), Eric Edward Nord, Crist, Krogh & Nord, PLLC, Billings, Montana

          Argued and Submitted: November 7, 2019

                  Decided: May 20, 2020

Filed:

            _____
                      Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    On May 20, 2019, the United States Court of Appeals for the Ninth Circuit issued an order pursuant to M. R. App. P. 15, certifying to this Court a question of first impression under Montana law:

> *Whether, under Montana law, dinosaur fossils constitute "minerals" for the purpose of a mineral reservation?*

We entered an order on June 4, 2019, accepting the certified question as written. We observe the importance of the state law question, the public policy ramifications, and the need for clarity in the law governing similar and subsequent property interest disputes in Montana.

¶2    We conclude that the answer to the question is no.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    The following facts and procedural history were supplied by the Ninth Circuit in the certification order and its attachments. The attachments contained the federal district court opinion, *Murray v. Billings Garfield Land Co.*, 187 F. Supp. 3d 1203 (D. Mont. 2016) [hereinafter *Murray I*], and the Ninth Circuit panel decision, *Murray v. BEJ Minerals, LLC*, 908 F.3d 437 (9th Cir. 2018) [hereinafter *Murray II*].

¶4    George Severson owned and operated a sizeable farm and ranch in Garfield County, Montana, until 1983 when he began leasing the land to Mary Ann and Lige Murray (Murrays), who worked there as ranchers. From that point, George Severson periodically transferred portions of his interest in the property to his sons, Jerry and Robert Severson (Seversons), and sold his remaining interests to the Murrays. From approximately 1991

2

until mid-2005, nearly fifteen years, the Murrays ran the property in partnership with the Seversons under the Murray Severson Ranch Partnership.

¶5     In 2005, the Seversons severed the surface estate of the property from the mineral estate and sold their remaining interests in the surface estate to the Murrays.  The purchase agreement required the parties to execute a mineral deed at closing, apportioning one-third of the mineral rights to Robert Severson, one-third to Jerry Severson, and one-third to the Murrays.  The Murrays thereafter owned the entire surface estate and a minority interest in the mineral estate.

¶6     The recorded mineral deed expressly provided for the parties' ownership, together as tenants in common, of:

> all right title and interest in and to all of the oil, gas, hydrocarbons, and minerals in, on and under, and that may be produced from the [property] . . . together with the right, if any, to ingress and egress at all times for the purpose of mining, drilling, exploring, operating, and developing said lands for oil, gas, hydrocarbons, and minerals, and storing, handling, transporting, and marketing the same therefrom with the rights to remove from said lands all of Grantors' property and improvements.

The purchase agreement for the transaction obligated both parties "to inform all of the other Parties of any material event which may [affect] the mineral interests and [to] share all communications and contracts with all other Parties."  The facts indicate that when the sale was completed in 2005, neither the Murrays nor the Seversons: (1) suspected that there were valuable dinosaur fossils on the property; (2) considered whether dinosaur fossils would be included in the mineral estate as defined in their 2005 mineral deed; or (3) expressed any specific intent about who would be entitled to ownership of any dinosaur fossils found on the property.  The Seversons' majority interest in the mineral estate is

3

presently held by two entities. Robert Severson's one-third interest is owned by BEJ Minerals, LLC (BEJ), and Jerry Severson's one-third interest is owned by RTWF LLC (RTWF). Hereinafter, the Seversons, BEJ, and RTWF are collectively referred to as "BEJ."

¶7 In the fall of 2005, shortly after the conveyance, the Murrays happened upon a "spike cluster" fossil on the property, a finding they thought to be insignificant at the time. However, following that initial discovery, the Murrays found and excavated several valuable dinosaur fossils on the property, including: the fossilized remains of two dinosaurs locked in combat (the Dueling Dinosaurs), discovered in 2006; a *Triceratops* foot, discovered in 2007; a large *Triceratops* skull, discovered in 2011; and the nearly complete fossilized remains of a *Tyrannosaurus rex* (the Murray T. Rex), discovered in 2013. The parties do not dispute that these discoveries are extremely rare and highly valuable. For instance, the parties stipulate that the Dueling Dinosaurs are worth several million dollars, given their "huge scientific value" as a "one-of-a-kind find." The Murrays sold the *Triceratops* foot for $20,000 and have offered to sell the skull for between $200,000 and $250,000. Lastly, the Murray T. Rex is one of only a dozen intact *Tyrannosaurus rex* skeletons of its quality ever found and was sold by the Murrays to a Dutch museum in 2014 for several million dollars. The funds are being held in escrow pending resolution of this litigation. BEJ represents that the Murrays first notified the other mineral titleholders of the fossil discoveries in 2008.

¶8 In 2013, BEJ claimed an ownership interest in the fossils, given its stake as a mineral titleholder. The Murrays, as owners of the entire surface estate, thereafter sought a declaratory judgment in Montana's Sixteenth Judicial District Court, Garfield County, affirming that the fossils found on the property are owned solely by the Murrays. BEJ removed the case to the United States District Court for the District of Montana, Billings Division, on August 21, 2014, asserting diversity jurisdiction. BEJ then filed a counterclaim, requesting a declaratory judgment that, under Montana law, the fossils are "minerals" and part of the mineral estate. BEJ also sought an order directing the Murrays to provide BEJ with a full accounting of all unearthed fossils and any contracts formed, and expenses and profits incurred, as a result of the excavated fossilized dinosaurs. Both parties moved for summary judgment.

¶9 In considering summary judgment, the federal district court recounted the two previous occasions in which this Court addressed whether a particular material qualified as a "mineral" in property conveyances. In *Farley v. Booth Bros. Land & Livestock Co.*, 270 Mont. 1, 4, 890 P.2d 377, 378-79 (1995), this Court was informed by the reasoning of the Texas Supreme Court in *Heinatz v. Allen*, 217 S.W.2d 994 (Tex. 1949), when we were called upon to decide whether scoria, a material used for road construction, should be characterized as a mineral in land transfers. However, we declined to expressly adopt the *Heinatz* test for all mineral disputes moving forward. Years later, in *Hart v. Craig*, 2009 MT 283, ¶¶ 4-6, 352 Mont. 209, 216 P.3d 197, we addressed whether sandstone, a material used for landscaping, should be included in a general mineral reservation in a surface deed transfer, and drew upon the *Farley* court's reasoning—citing *Heinatz*—to

5

resolve the question. In both instances, we adhered to ordinary principles of contract interpretation to effectuate the intent of the contracting parties, ultimately concluding the materials in question were outside the ordinary and natural meaning of the term "mineral."

¶10 Using these same principles, the *Murray I* court granted summary judgment to the Murrays, reasoning that fossils "are not included in the natural and ordinary meaning of 'mineral'" and declaring the Murrays the sole owners of the dinosaur fossils because of their undivided ownership of the surface estate. *Murray I*, 187 F. Supp. 3d at 1212. On appeal, a Ninth Circuit panel reversed the district court decision. *Murray II*, 908 F.3d at 448. Following the panel decision, the Murrays filed a petition for rehearing and rehearing en banc. Pursuant to F. R. App. P. 35(a), the Ninth Circuit, proceeding en banc, entered a stay and certified the question to this Court for resolution of the dispositive issue under Montana law.

## STANDARD OF REVIEW

¶11 M. R. App. P. 15(3) permits this Court to answer a question of law certified to it by another qualifying court. Our review of the certified question of law is "purely an interpretation of the law as applied to the agreed facts underlying the action." *BNSF Ry. Co. v. Feit*, 2012 MT 147, ¶ 6, 365 Mont. 359, 281 P.3d 225 (quoting *State Farm Fire & Cas. Co. v. Bush Hog, LLC*, 2009 MT 349, ¶ 4, 353 Mont. 173, 219 P.3d 1249).

## DISCUSSION

¶12 *Whether, under Montana law, dinosaur fossils constitute "minerals" for the purpose of a mineral reservation?*

¶13 Notably, the Ninth Circuit declined to structure its question in a way that would limit the scope of our determination to those dinosaur fossils presently at issue, and instead chose to broadly formulate the question using all-inclusive legal terms. We determine the Ninth Circuit seeks a reliable and consistent construction of what a general mineral reservation is thought to contain—whether fossils or not—in an effort to guide subsequent parties drafting mineral deeds and the courts that inevitably interpret those deeds.[1]

¶14 BEJ argues that this Court's "settled test" under *Farley* and *Hart* for determining mineral status involves a two-part inquiry: (1) whether the material at issue is technically a mineral; and, if yes, (2) whether that material is "exceptionally rare and valuable." The Murrays respond that BEJ mischaracterizes the test from *Farley* and *Hart*. They assert instead that the ordinary and natural meaning of "mineral" does not include dinosaur fossils. The Murrays contend that whether a substance is rare and valuable cannot be the only consideration in a mineral status analysis.

¶15 In *Farley* and *Hart*, this Court considered whether a particular material constituted a mineral for purposes of property transfers and wrestled with the "ordinary and natural meaning" of "mineral," in an attempt to give effect to the intention of the contracting

---

[1] As of April 16, 2019, Montana law states that dinosaur "fossils are not minerals and that fossils belong to the surface estate," H.B. 229, 66th Leg. (Mont. 2019), unless the transacting document explicitly provides otherwise. Section 1-4-112, MCA (2019). The retroactivity § 1-4-112, MCA, has not been litigated. *See* § 1-4-111(2), MCA (2019).

7

parties.   On both occasions we were informed by the reasoning of an often-cited 1949 decision by the Supreme Court of Texas in *Heinatz*:

> In our opinion substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitabl[y] be manufactured into cement.  Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word.

*Heinatz*, 217 S.W.2d at 997.  However, despite the reliance of this Court and many other courts on the *Heinatz* reasoning, disagreement over the term "mineral" remains the source of considerable mineral law litigation nationwide.

¶16    The courts in *Murray I* and *Murray II* each supposed that this Court, although not expressly, had adopted the general principles of *Heinatz* for determining whether a particular substance is a mineral in the context of deeds and agreements involving mineral rights.  We take this opportunity to affirm those courts' assumptions, but clarify that the end goal when analyzing a general mineral reservation is to interpret the term "minerals" according to its "ordinary and natural meaning," unless the parties manifest a different intention in the transacting document.[2] *Heinatz*, 217 S.W.2d at 997.  We reiterate two key principles, helpfully identified in *Murray I,* along with additional considerations pertinent to the determination.  First, for purposes of property transfers, "the focus of the test articulated by *Heinatz* does not turn on whether the substance is 'rare and exceptional

---

[2] "In other words, when Party A transfers to Party B the rights to all 'minerals' in the estate, the court presumes that parties intended to apply the ordinary and natural meaning of 'minerals,' unless the contract says otherwise." *Murray II*, 908 F.3d at 449 (Murguia, J., dissenting).

8

in character.'"[3]   *Murray I*, 187 F. Supp. 3d at 1209.   Whether a material is "rare and valuable" is only one factor to be considered in a court's attempt to determine if the material could fall into the ordinary meaning of "mineral."   Second, "a material's inclusion in the scientific definition of 'mineral' is not determinative," absent a showing of an intention to use the scientific definition in the conveying instrument. *Murray I*, 187 F. Supp. 3d at 1210; *see also Heinatz*, 217 S.W.2d at 997.  We would add a third consideration to the analysis, identified in both *Murray I* and *Heinatz:* the relation of the material in question to the surface of the land, and the method and effect of the material's removal.  *Heinatz*, 217 S.W.2d at 995-96.

¶17   We offer that the best method for determining whether a substance fits within the ordinary and natural meaning of "mineral" is to use contextual cues, e.g., an analysis of the term as used in the instrument; whether the material's mineral content makes it rare and valuable; and the material's relation to, and the effect of removal on, the surface.  These factors should be analyzed with a mind toward the overarching goal of effectuating the parties' intent.

¶18   We turn now to that inquiry.

---

[3] The *Heinatz* court asked whether the substance in question was "rare and exceptional in character or possess[ed] a peculiar property giving [it] special value."  *Heinatz*, 217 S.W.2d at 997.  This Court, in *Farley* and *Hart*, summarized the *Heinatz* inquiry by asking whether the substance was "exceptionally rare and valuable."  *Farley*, 270 Mont. at 6, 890 P.2d at 380 (citation omitted); *Hart*, ¶¶ 5-7.  For brevity, as "exceptional" and "rare" are synonyms, our reference to this factor of the inquiry asks whether the material in question is "rare and valuable."

9

**Factor 1: The language of "Minerals" as used in the Mineral Deed**

¶19    Our analysis begins by examining the language surrounding the term "minerals," and the term itself, as used in the mineral deed between the Murrays and BEJ. The fact that the *Murray I* and *Murray II* courts have been parsing through the second- and third-listed dictionary definitions of "mineral" is an acknowledgment of the polysemous nature of the word itself; that is, it has multiple meanings depending on the context.[4] Asking only what the meaning of "minerals" is, rather than the meaning of "minerals" as used in the phrasing of the deed, "oil, gas, hydrocarbons, and minerals in, on and under, and that may be produced from the [property]," together with the right of "mining, drilling, exploring, operating, and developing said lands for oil, gas, hydrocarbons, and minerals," risks failing to thoroughly inquire whether the answer to the first question is different than the meaning derived from the second. *See* Restatement (Second) of Contracts § 202 cmt. d (Am. Law Inst. 1971) ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph."); *see also Textron Lycoming Reciprocating Engine Div. v. United Auto*, 523 U.S. 653, 657, 118 S. Ct. 1626, 1629 (1998) ("It is not the meaning of 'for' we are seeking here, but the meaning of 'suits for violation of contracts.'").

¶20    Deeds are interpreted like contracts. *See Hudson v. Irwin*, 2018 MT 8, ¶ 15, 390 Mont. 138, 408 P.3d 1283 (citations omitted). Courts interpret contracts according to

---

[4] *See Deal v. United States*, 508 U.S. 129, 131-32, 113 S. Ct. 1993, 1996 (1993), *superseded by statute*, First Step Act of 2018, Pub. L. No. 115-391, § 403(a), 132 Stat. 5194, 5221-22, *as recognized in United States v. Davis*, __ U.S. __, 139 S. Ct. 2319, 2324 n. 1 (2019) (It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning

their plain and ordinary meaning and will not insert into the contract what has been omitted or omit what has been inserted. *See* §§ 1-4-101, -107, MCA; *Schwend v. Schwend*, 1999 MT 194, ¶ 39, 295 Mont. 384, 983 P.2d 988 (citation omitted). In this state, a contract must be interpreted in such a way as to give effect to the mutual intention of the parties as it existed at the time of contracting, § 28-3-301, MCA, and, where reduced to a writing, the intention of the parties should be ascertained from the writing alone if possible, § 28-3-303, MCA. In this instance, we are not faced with resolving an ambiguity in the deed language. *See Schwend*, ¶ 39; *Morning Star Enters. v. R. H. Grover, Inc.*, 247 Mont. 105, 111, 805 P.2d 553, 557 (1991). However, that the *Murray I* and *Murray II* courts looked outside the Murray-BEJ mineral deed to ascertain the parties' intent means the intention of the parties was not clear on the face of the instrument. Therefore, it is not feasible to determine the meaning the parties gave to the words from the instrument alone. In *Farley*, 270 Mont. at 5-6, 890 P.2d at 379, this Court looked to different statutory definitions of "mineral" at § 82-4-303(7), MCA, and § 82-4-403(6), MCA, for guidance as to whether scoria is considered a mineral under Montana law. The *Farley* Court noted that scoria was included in the definition of "mineral" in § 82-4-403(6), MCA, but not clearly included in the definition in § 82-4-303(7), MCA, and observed that this inconsistency is evidence that the meaning of the term is dependent upon its context.[5] These varying

---

of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

[5] Contrary to the Dissent's assertion, this same principle of contextual usage as identified in *Farley does* guide the Court today. Dissent, ¶ 7. In fact, context should guide the Court's discussion of all cited statutory definitions. The Dissent selectively excerpts portions of statutes

11

contextual statutory applications of "mineral" necessitated the use of other authorities to determine whether a certain material is commonly understood to be a mineral in land transfers.

---

as support for its contention that "some of [these statutes] actually support the definition of fossils as minerals." Dissent, ¶ 7. For example, the Dissent quotes § 82-4-303(16), MCA, to define mineral as: "any ore, rock, or substance . . . that is taken from below the surface or from the surface of the earth for . . . other subsequent use[.]" Dissent, ¶ 5. The full text of § 82-4-303(16), MCA, is quoted *infra* ¶ 25.

The Dissent likewise abbreviates § 70-9-802(9), MCA, and as is true for § 82-4-303(16), MCA, the full definition is available *infra* ¶ 25. Dissent, ¶ 6 ("The second source the Court cites for its contention that fossils and minerals are mutually exclusive terms defines mineral to mean, *among other things*, 'any other substance defined as a mineral by the law of this state.'" (emphasis added)).

The Dissent provides that a select portion of § 15-38-103(3), MCA, "defines 'mineral' to include, *among other things*, 'nonrenewable merchantable products extracted from the surface or subsurface of the state of Montana.'" Dissent, ¶ 5 (quoting an excerpt of § 15-38-103(3), MCA) (emphasis added). The full text of § 15-38-103(3), MCA, defines "mineral" as "any precious stones or gems, gold, silver, copper, coal, lead, petroleum, natural gas, oil, uranium, talc, vermiculite, limestone, or other nonrenewable merchantable products extracted from the surface or subsurface of the state of Montana."

We would direct the Dissent to its own insistence that this Court "recognize that the definition of mineral can differ according to the context in which it is used," and accordingly, maintain that the context of these various statutory definitions and references to "mineral" must be fully represented. Dissent, ¶ 7; *see also* § 1-2-106, MCA ("Words and phrases used in the statutes of Montana are construed according to the context and the approved usage of the language . . . ."). It is true that each statutory definition referenced by the Dissent includes—in addition to individually named members of the specified group or class of minerals—catch-all terminology that, when isolated, can be retrofitted by a court to include any number of matter. However, when viewed in their full context, with the surrounding words and circumstances, these statutory definitions of "mineral" clearly contemplate "minerals" in the context of industry production of oil, gas, metals, gemstones, ore, rocks, chemical raw materials, and other mineral resources that are similarly mined, milled, concentrated, smelted, manufactured, or put through some related process for further refinement and eventual gain or profit from their production, distribution, or consumption. Using dinosaur fossils as educational museum exhibits and artifacts for paleontological research, although bought and paid for, is not tantamount to the removal and refinement of mineral resources for use as raw materials in producer goods, consumer goods, or other commodities.

12

¶21   BEJ contends "[t]here is no evidence—whether in the deed or elsewhere—that the parties intended to restrict the scope of what would otherwise be considered a 'mineral' under applicable Montana law." It argues that this Court does not turn to dictionary and statutory definitions to ascertain the terms of a deed between private parties. On the other hand, the Murrays point to the language of the contract, and several statutory, regulatory, and dictionary definitions of "mineral," none of which specifically reference dinosaur fossils as minerals, and urge us to apply to the deed language the maxim of *expressio unius est exclusio alterius*: expression of one thing implies exclusion of another. *See Carbon Cty. v. Union Reserve Coal Co.*, 271 Mont. 459, 466, 898 P.2d 680, 684 (1995). Our analysis of the parties' intention behind use of the term "minerals" in the phrase "oil, gas, hydrocarbons, and minerals in, on and under, and that may be produced from the [property]" together with the right of "mining, drilling, exploring, operating, and developing said lands for oil, gas, hydrocarbons, and minerals," is aided by case law interpreting mineral deeds and other contracts. *See, e.g.*, *Carbon Cty.*, 271 Mont. at 469-71, 898 P.2d at 686-87; *Farley*, 270 Mont. at 4-5, 890 P.2d at 379; *Mont. Rail Link, Inc. v. Travelers Indem. Co.*, No. CV 10-16-M-DWM, 2011 U.S. Dist. LEXIS 12811, at *9-10 (D. Mont. Feb. 9, 2011).

¶22   As stated above, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. Where the intention of the parties is not ascertainable from the face of the instrument, that intention "may be explained by reference to the circumstances under which it was made and the matter to which it relates."

13

Section 28-3-402, MCA. "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Section 28-3-305, MCA. Just as the "most fundamental guide to statutory construction" is common sense, *First United Methodist Church v. U.S. Gypsum Co.*, 882 F.2d 862, 869 (4th Cir. 1989), so too should common sense guide this court in ascertaining the intention behind undefined terms in a mineral deed.[6]

¶23　In *Carbon Cty. v. Union Reserve Coal Co.*, this Court was tasked with deciding whether Carbon County, the sole owners of a mineral estate, intended to include coal seam methane gas in a deed conveying "all coal and coal rights." *Carbon Cty.*, 271 Mont. at 462, 898 P.2d at 681-82. We examined various dictionary, statutory, and regulatory definitions and two opinions from the Solicitor of the Department of the Interior (DOI) to determine that coal and gas are mutually exclusive terms under Montana law. *Carbon Cty.*, 271 Mont. at 469-71, 898 P.2d at 686-87. Given coal and gas were mutually exclusive terms, we then held that, although the language of the mineral deed conveyed coal to the other party, Carbon County retained ownership of all other mineral interests not conveyed, including coal seam methane gas. *Carbon Cty.*, 271 Mont. at 472-73, 898 P.2d at 688-89 (citing § 28-3-305, MCA). The Court in *Carbon Cty.* explained:

> [T]he express grant of one specific mineral does not imply the grant of all other minerals not referred to in the grant. The maxim *expressio unius est*

---

[6] *See, e.g.*, *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 26, 315 Mont. 281, 68 P.3d 703 ("The terms and words used in an insurance contract are to be given their usual meaning and construed using common sense."); *Carbon Cty.*, 271 Mont. at 468-69, 898 P.2d at 686 (adopting the analysis of *S. Ute Indian Tribe v. AMOCO Prod. Co.*, 874 F. Supp. 1142, 1153-54 (D. Colo. 1995) which states: "Even without aid of reference to such definitional sources, common sense dictates that in 1909 and 1910, Congress intended 'coal' to mean the solid rock substance").

14

> *exclusio alterius* (the expression of one thing is the exclusion of another) is routinely cited in Montana case law. *See Matter of Estate of Donovan*, 169 Mont. 278, 282, 546 P.2d 512, 514 (1976); *Teters v. Montana Eastern Pipe Line Co.*, 117 Mont. 477, 482, 159 P.2d 515, 517 (1945); *Berne v. Stevens*, 67 Mont. 254, 258, 215 P. 803, 804 (1923). Furthermore, this principle has been directly applied to mineral law in *Smoot v. Consolidated Coal Co.*, 114 Ill. App. 512, 517 (1904).

*Carbon Cty.*, 271 Mont. at 466, 898 P.2d at 684. The maxim applies equally well here. "Fossils" are not included in the expression "oil, gas, and hydrocarbons" and cannot be implied in the general grant of all other minerals.

¶24 There is no dispute that the common understanding of "mineral," both between the parties here, and in ordinary usage, includes the mining of hard compounds or oil and gas for refinement and economic exploitation. The deed itself specifically identifies the minerals "oil, gas, and hydrocarbons" which may be "produced" from the property. The mineral deed makes no statement about reserving to BEJ the fossils from the property. Further, neither the Murrays nor BEJ considered whether dinosaur fossils would be included in the mineral estate or expressed any specific intent about who would be entitled to ownership of any dinosaur fossils found on the property. The question thus is whether fossils, as the remains of once-living organisms, are part of the group of "minerals" identified in the deed when other language in the deed specifically references "oil, gas, and hydrocarbons," which are mined for further refinement and economic exploitation.

¶25 A brief examination of definitions from various sources reveals that minerals and fossils are mutually exclusive terms under Montana law. For example, there are several statutory definitions of "mineral" found in Montana law. In the context of "Metal Mine Reclamation," § 82-4-303(16), MCA, defines "mineral" as:

15

any ore, rock, or substance, other than oil, gas, bentonite, clay, coal, sand, gravel, peat, soil materials, or uranium, that is taken from below the surface or from the surface of the earth for the purpose of milling, concentration, refinement, smelting, manufacturing, or other subsequent use or processing or for stockpiling for future use, refinement, or smelting.

Under the "Uniform Unclaimed Property Act," § 70-9-802(9), MCA, defines "mineral" to mean:

gas; oil; coal; other gaseous, liquid, and solid hydrocarbons; oil shale; cement material; sand and gravel; road material; building stone; chemical raw material; gemstone; fissionable and nonfissionable ores; colloidal and other clay; steam and other geothermal resource; or any other substance defined as a mineral by the law of this state.

Montana's tax code requires "[e]very person engaged in mining, extracting, or producing from any quartz vein or lode, placer claim, dump or tailings, or other place or source whatever precious stones or gems, vermiculite, or other valuable mineral, except bentonite, coal, and metals," to file with the Montana Department of Revenue a statement of gross yield and value of the minerals mined by March 31 each year for calculation of taxes owed on the extracted minerals. Section 15-23-502, MCA. This statement must include:

(1) the name and address of the owner . . . of the mine . . . ;
(2) the description and location of the mine;
(3) the number of tons of ore or other mineral products or deposits extracted, produced, and treated or sold from the mine during the period covered by the statement;
(4) the amount and character of the ores, mineral products, or deposits and the yield of the ores, mineral products, or deposits from the mine in constituents of commercial value . . . ;
(5) the gross yield or value in dollars and cents;
(6) cost of extracting from the mine;
(7) cost of transporting to the place of reduction or sale;
(8) cost of reduction or sale;
(9) cost of marketing the product and conversion of the product into money;
. . .

16

(14) cost of testing extracted minerals for the purpose of satisfying federal or state health and safety laws or regulations, the cost of plant security in Montana, the cost of assaying and sampling the extracted minerals, and the costs incurred in Montana for engineering and geological services for existing mining operations but not including any services beyond the stage of reduction and beneficiation of the minerals . . . .

Section 15-23-502, MCA. Clearly, given these examples, Montana has an extensive statutory framework dealing with mining of all types in a number of different circumstances. However, unlike the situation in *Farley*, where scoria was included in one statutory definition of "mineral" and unmentioned in another, Montana statutes do not conflict as to whether fossils are included in the various definitions of "mineral." As "fossils" are not included in any of the above definitions or references to "minerals" under Montana law, it is highly unlikely that fossils are contemplated as such; just as it is highly unlikely that the Murrays filed a statement of yield with the Department of Revenue divulging the value gained from the extraction of the fossils, the weight in tons of the dinosaur fossils extracted, the description and location of the extraction sites (which, under BEJ's theory, would hereinafter be "mines" under Montana law), or the cost of compliance with federal or state health and safety laws and regulations, given health and safety laws and regulations applicable to mines are not applicable to fossil excavation on private land.

¶26    In contrast, the only references to "fossil" or "fossils" under Montana statutory law occur not in Title 82, entitled "Minerals, Oil, and Gas," but in Title 22, "Libraries, Arts, and Antiquities," and Title 1, "General Laws and Definitions." Section 22-3-107, MCA, outlines the powers and duties of the board of trustees of the Montana historical society, which includes the power to: "collect and preserve such natural history objects as fossils,

17

plants, minerals, and animals." This statute differentiates between fossils and minerals by separately listing the terms. Section 22-3-107(13), MCA. The only other reference to "fossil" under Montana law as it existed at the time of the Murray-BEJ conveyance occurs in § 1-1-509, MCA, which lists the "duck-billed dinosaur Maiasaura peeblesorum" as the official Montana state fossil.[7]

¶27 The Montana Department of Natural Resources and Conversation (DNRC) has included fossils in its definition of "paleontological remains" in the context of "Antiquities on State Lands": "'Paleontological remains' means fossilized plants and animals of a geological nature found upon or beneath the earth or under water which are rare and critical to scientific research." Admin. R. M. 36.2.802(8). Just as § 22-3-107(13), MCA, distinguishes between minerals and fossils by separately listing each item, DNRC also separately references the terms in the regulatory context of "Recreational Use of State Lands":

---

[7] The preamble to the bill designating the Montana state fossil provides:

> WHEREAS, *dinosaur sites* in Montana contain fossilized eggs, embryonic bone, babies, juveniles, and adults of several different types of dinosaurs . . . ; and WHEREAS, the Montana discoveries have tremendous scientific value and will continue to receive widespread publicity in national and international journals, as well as in popular literature and television and radio programs; and WHEREAS, naming a dinosaur as the state fossil will increase awareness that Montana is one of the best places in the world for the occurrence of important dinosaur discoveries and will have real economic value *in terms of tourist promotion . . . .*

1985 Mont. Laws ch. 37 (emphasis added). In designating a state fossil, the Montana Legislature was not contemplating the value of dinosaur fossils in terms of their further refinement and economic exploitation as mineral resources, but as paleontological finds valuable for their scientific contributions. Interestingly, the excavation location of dinosaur fossils are referred to as "dinosaur sites," not "mines."

18

> "General recreational use" means non-concentrated, non-commercial recreational activity, except: (a) collection, disturbance, alteration, or removal of archeological, historical, or paleontological sites or specimens (e.g., fossils, dinosaur bones, arrowheads, old buildings, including siding) (which requires an antiquities permit pursuant to 22-3-432, MCA); (b) mineral exploration, development, or mining (which requires a lease or license pursuant to Title 77, chapter 3, MCA); (c) collection of valuable rocks or minerals (which requires a lease or license pursuant to Title 77, chapter 3, MCA) . . . .

Admin. R. M. 36.25.145(11).

¶28 Also informative is a longstanding administrative decision by the DOI, *Earl Douglass*, 44 Interior Land Dec. 325, 326 (1915), in which Douglass, a paleontologist, attempted to procure a large dinosaur site on federal land by filing a mining claim. Upon receiving the mining claim, Clay Tallman, Commissioner of the General Land Office, directed Douglass, through the local Land Office registrar, to "furnish a further showing as to the mineral character of [Douglass's] Mineral Entry." Letter from Charles DeMoisy, Registrar, General Land Office of Vernal, Utah, to Earl Douglass, Paleontologist, Carnegie Museum (Aug. 21, 1913) (on file with Carnegie Mellon University Libraries Digital Collections). Douglass made his case in a response letter to Tallman dated September 17, 1913, as to why fossils should be considered "minerals" under federal mining law. In this letter, Douglass described his mining claim as a "test case . . . for the purpose of ascertaining whether a ruling could not be had from the Secretary of the Interior declaring that petrified or mineralized bones are minerals." Letter from Earl Douglass, Paleontologist, Carnegie Museum, to Clay Tallman, Commissioner, General Land Office, 2 (Sept. 17, 1913) (on file with Carnegie Mellon University Libraries Digital Collections). The letter goes on to state:

19

> Coal is fossil vegetable matter, but no one will dispute that coal is a mineral. The bones that we have been extracting from this quarry are fossil matter from which all of the animal substance has been removed and has been replaced by silicon or lime, which no one will dispute are minerals.

Letter from Earl Douglass at 2. Interestingly, these arguments made by Douglass as to why fossils should be considered "minerals" under federal law bear resemblance to those arguments advanced in the present case by BEJ. Despite Douglass's contentions, DOI specifically ruled that dinosaur fossils are not "mineral[s] within the meaning of public land laws" because they are "not recognized as . . . mineral[s] by standard authorities on the subject." Citing to another administrative decision, *South Dakota Mining Co. v. McDonald*, 30 Interior Land Dec. 357 (1900), as being similar to *Earl Douglass* in principle, the *Earl Douglass* decision includes an excerpt from the *South Dakota Mining* summary:

> Land not shown to contain deposits, in paying quantities, of any of the mineral substances usually developed by mining operations, but which appears to be valuable and to be desired by the parties attempting to secure title thereto chiefly because of a cave or cavern the entrance to which is situated thereon, and for the crystalline deposits, and formations of various kinds, such as stalactites, stalagmites, geodes, etc., found therein, which are made the subject of sale by the parties not as minerals but as natural curiosities, is not mineral land within the meaning of the mining laws.

*Earl Douglass*, 44 Interior Land Dec. at 326 (quoting *South Dakota Mining*, 30 Interior Land Dec. at 357).

¶29 Although the *Murray II* court dismissed many of these sources as irrelevant to its analysis because they "relate to a particular statutory scheme," we disagree. *Murray II*, 908 F.3d at 446 n. 9. These various instances of reference to "minerals," "mining," and "fossils" in Montana law give contextual clues to how the terms are

20

understood in this state. We see no harm in surveying Montana statutes and regulations, and available federal sources, to form an understanding of the law as it existed when the Murrays and BEJ entered into their agreement. These statutes, regulations, and federal guidance—in existence at the time the Murray-BEJ deed was signed—are part of the "circumstances under which [the deed] was made and the matter to which it relates," § 28-3-402, MCA, and are helpful to this Court in "plac[ing itself] in the position of those whose language [we are] to interpret." Section 1-4-102, MCA.

¶30     Given the overwhelming authority showing "fossils" and "minerals" are separately accounted for under Montana law, we conclude that the terms are mutually exclusive as used in the mineral deed between the Murrays and BEJ. The Murrays, as owners of the surface estate, maintain ownership of any interests not reserved by BEJ in the general mineral deed. *Libby Placer Mining Co. v. Noranda Minerals Corp.*, 2008 MT 367, ¶ 39, 346 Mont. 436, 197 P.3d 924 ("A grantee of the land other than the minerals or with the minerals reserved or excepted from the grant gets title to all the surface, and the grantor has a fee simple in the minerals retained." (quoting 53A Am. Jur. 2d *Mines and Minerals* § 181 (2006))).[8] Therefore, although the term "minerals" as used in the Murray-BEJ mineral deed may seem broad on its face, the contract is restricted to its apparent objects, i.e., "only to those things concerning which it appears that the parties intended to contract."

---

[8] After the mineral is conveyed separately from the land, two distinct estates exist, each of which is separate from the other. The owner of each estate has the right to exercise all the incidents of ownership in the same manner as over other property he or she may possess, subject only to such rights or servitudes existing in favor of the other owner. *Libby Placer Mining*, ¶ 39 (quoting 58 C.J.S. *Mines and Minerals* § 164 (1998)).

21

Section 28-3-305, MCA. Despite BEJ's attempts to conflate "fossils" and "minerals," the dinosaur fossils found on the Murray property are not minerals under the word's common and ordinary meaning. It is apparent that the parties did not intend to include dinosaur fossils in the 2005 general mineral deed by way of reference to "minerals." The parties themselves admit they did not consider whether dinosaur fossils would be included in the mineral estate or express any specific intent about who would be entitled to ownership of any dinosaur fossils found on the property. As the terms "fossils" and "minerals" are mutually exclusive under Montana law, and given the restriction on contracts to the instrument's apparent objects, the language of the mineral deed does not contemplate inclusion of "fossils" under the broad reservation of "minerals."

¶31 When we consider the language of the instant general mineral reservation deed, this Court would have to insert "dinosaur fossils" into the term "minerals" or construe "dinosaur fossils" as a type of "mineral," when, had the parties contemplated that the reservation would include dinosaur fossils, the parties could have provided for that occurrence themselves. Moreover, the mineral properties of dinosaur fossils, to the extent they may be scientifically described as "minerals," are not what makes them valuable for production from the property, such as oil, gas, hydrocarbons, or other traditional minerals. Dinosaur fossils are not valuable as raw material to be processed into fuel or goods; nor are they mined and then manufactured into jewelry. Unlike the oil, gas, hydrocarbons, and minerals specifically named in the deed, fossils were not so identified and are not a "mineral" which is subject to further refinement before becoming economically exploitable, as the term is contemplated under Montana law. "Minerals" are more

22

commonly thought of as a resource, often nonrenewable, including hard compounds, oil, or gas, mined as a raw material for further processing, refinement, and eventual economic exploitation.

¶32     Accordingly, in the context of a general mineral reservation deed, where the parties have not manifested a different intention in the transacting document, the language identifying "mineral" would not ordinarily and naturally include fossils.

**Factor 2: Rare and Valuable Because of Mineral Composition**

¶33     The second factor important to determining the ordinary and natural meaning of "mineral" asks whether the mineral content of the material in question renders it "rare and valuable." *See Farley*, 270 Mont. at 7-8, 890 P.2d at 380; *Hart*, ¶¶ 6-7; *Heinatz*, 217 S.W.2d at 997. BEJ urges this Court to consider only whether the material is rare and valuable, excluding other relevant information in our determination of the certified question. We decline to adopt such a narrow and insular approach. If this Court were to accept BEJ's method, we would be embracing a test in which the party claiming a particular substance to be a mineral need only unilaterally prove its rarity and value, and declare that both parties must have therefore meant to include it in the mineral conveyance. Such a test would neglect to thoroughly examine for the ordinary and natural meaning of "mineral" by failing to account for the use of the substance, its relation to the surface, and its method of removal.

¶34     It is clear that the test as phrased in *Heinatz* is not so limited as BEJ espouses: "In our opinion substances . . . are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving

23

them special value." *Heinatz*, 217 S.W.2d at 997. The *Heinatz* court's analysis of this factor heavily focused on the usefulness of the substance in question. Without some characteristic in a substance's mineral content or make-up designating that substance as valuable for further refinement and economic exploitation, then the substance in question is not "regarded as [a] mineral[] in the ordinary and generally accepted meaning of the word." *Heinatz*, 217 S.W.2d at 997.[9] This interpretation of *Heinatz* is consistent with this Court's decisions in *Farley* and *Hart*. Specifically in *Hart*, ¶ 5, we discussed the particular qualities of sandstone which place that material outside the ordinary and natural meaning of "mineral," stating, "However, this rock is not very special, nor is it exceptionally rare and valuable. *It does not have to be changed, refined, or processed to be used commercially*." (emphasis added).

¶35    It would be disingenuous to assert that, in the literal sense, the four dinosaur fossils at issue are not rare and valuable. However, as the district court noted, although the Dueling Dinosaurs, the Murray T. Rex, and the *Triceratops* foot and skull are valuable finds, not all dinosaur fossils—even others found on the Murray property—are considered rare and valuable. *Murray I*, 187 F. Supp. 3d at 1207. This means that dinosaur fossils are

---

[9] The *Heinatz* court used two examples to illustrate its point: (1) sand with a certain composition making it useful, and therefore valuable, for making glass; and (2) limestone of such a quality that it is useful, and therefore valuable, for cement manufacturing. *Heinatz*, 217 S.W.2d at 997. The *Murray II* court took these illustrations as evidence that the test from *Heinatz* is "non-categorical." *Murray II*, 908 F.3d at 447. We disagree. The *Heinatz* court was merely providing examples of how differences in a substance's chemical composition can result in that substance being either unsuitable or useful for refinement and economic exploitation. The distinction between sand or limestone that is valuable and sand or limestone that is not, turns on the materials' mineral properties; in contrast, dinosaur fossils' mineral composition is inconsequential in determining their value.

not rare and valuable because of their mineral properties; if that were the case, all dinosaur fossils would be considered rare and valuable. Instead, fossils' "value turns on characteristics other than mineral composition, such as the completeness of the specimen, the species of dinosaur, and how well the fossil is preserved." *Murray II*, 908 F.3d at 450 (Murguia, J., dissenting). Further, in contrast to the common understanding of "mining," where the substance is extracted and then further refined for economic purposes, dinosaur fossils are often found by luck, and are not economically valuable because of some mineral property that makes them subject to further refinement and use.[10] Dinosaur fossils are valuable because of their very existence as the remains of once-living vertebrates. *Murray I*, 187 F. Supp. 3d at 1212.

¶36 Because the rarity and value of dinosaur fossils is not a circumstance of their mineral composition and consequent usefulness for refinement and economic exploitation, they are not considered to fall within the ordinary and natural meaning of "minerals" as that term is used in a general mineral deed.

---

[10] Unfortunately, the Dissent misses this point by reference to the mineral composition of a diamond as support for its point that "[d]iamonds are valuable because they are rare and exceptional." Dissent, ¶ 9 ("A diamond is a mineral. It is also simply carbon."). However, diamonds are considered to be diamonds—and therefore rare and valuable—because of the "bonding between the carbon atoms that make up [the] material." *Collins v. Nissan N. Am., Inc.*, No. 2:11-CV-428-JRG, 2013 U.S. Dist. LEXIS 15749, at *3 (E.D. Tex. Feb. 6, 2013). This is the key distinction here. Diamonds are more or less valuable depending upon their mineral content and, resultingly, diamonds are considered rare and exceptional as a circumstance of their mineral properties. Some diamonds have mineral properties making them suitable for refinement into gemstones for use in jewelry; other diamonds not suitable for use as gemstones still have a mineral composition making them suitable for certain industrial uses, like polishing, cutting, grinding, or drilling. In either instance, diamonds' value is tied to their mineral composition. In contrast, a dinosaur fossil's value is not determined by the quality or configuration of its mineral properties. Its usefulness, and value, turns on factors unrelated to its mineral composition. Unlike diamonds, often characterized as a girl's best friend, fossils have yet to be typecast as the rancher's best friend.

## Factor 3: Relation to and Effect on the Surface

¶37    A material's relation to the surface of the land, and the method and effect of its removal, is the third factor relevant to whether a material qualifies as a "mineral," as that term is commonly understood in mineral conveyances. The court in *Heinatz* heavily focused its analysis on this factor in deciding whether limestone is a part of the mineral or surface estate.

¶38    In *Heinatz*, limestone was deemed closely related to the surface because it is "found exposed on the surface" in places, "underl[ies] most if not all of the land at varying and usually shallow depths," and is "sometimes found on the top of the surface and removed by quarrying after scraping off the overlying calichie [sic] or other top soil." *Heinatz*, 217 S.W.2d at 997. These facts led the court to conclude that limestone "is so closely related to the soil, so nearly a part of the very surface, the soil itself, that it is reasonably and ordinarily considered a part of the soil and as belonging to the surface estate rather than as a part of the minerals or mineral rights." *Heinatz*, 217 S.W.2d at 997. Here, dinosaur fossils are analogous to the limestone at issue in *Heinatz* because of their close relation to the surface of the land. Just as limestone is often found exposed or close to the top of the surface, "locating fossils involves walking, riding, or driving around to see if there are any bones lying around or sticking out of the ground." *Murray I*, 187 F. Supp. 3d at 1207. Fossils are so closely related to the surface of the land that soil erosion and other natural events may cause a fossil to become exposed to the surface. Dinosaur fossils, like limestone, bear a relationship so close to the surface as to be reasonably considered as part of the surface, rather than the mineral, estate.

26

¶39    Discussing the effect of removal of limestone on the surface estate, the *Heinatz* court commented that limestone is taken from the land by quarrying. Given that the process for quarrying involves stripping back the overburden to expose and excavate the limestone, "for each acre of land actually quarried five additional acres of land are for all practical purposes destroyed by the depositing of caliche and waste rock taken from the quary [sic]." *Heinatz*, 217 S.W.2d at 996. Since "limestone is recoverable only by quarrying on the open pit method," the effect of its removal is to destroy the surface for agricultural and grazing purposes. *Heinatz*, 217 S.W.2d at 998. For these reasons, the *Heinatz* court held:

> The fact that the particular substance, although technically a mineral, is recoverable only in this way, and with this result, is not decisive of the question, but it is a factor which is used with others in determining that the substance is not included in a conveyance or reservation of minerals.

*Heinatz*, 217 S.W.2d at 998 (citations omitted).

¶40    Excavation of dinosaur fossils impacts the surface estate in a manner similar to the *Heinatz* court's description of the effects of removal of limestone. Like the quarried limestone in *Heinatz*, fossils are not "mined" but rather are excavated. "A large excavation would interfere with the use of the surface estate—a factor which the *Heinatz* court found weighed heavily against a finding that limestone was a mineral." *Murray II*, 908 F.3d at 450 (Murguia, J., dissenting). We agree with the *Murray II* panel that, in a mineral transaction, "the quantity, quality, or type of substances present underneath the land may be unknown" to both parties, and that "the purpose of retaining or acquiring a mineral estate is to extract something valuable from the land." *Murray II*, 908 F.3d at 447. However, that this unknown exists is hardly grounds to disregard the effect on the surface

27

estate when, after all, the Murrays also acquired the property with the aim of procuring something of value.[11] Their investment should be just as consequential as BEJ's interests in oil, gas, hydrocarbons, and minerals—as the final term is ordinarily and commonly understood.

**CONCLUSION**

¶41    We conclude that, under Montana law, dinosaur fossils do not constitute "minerals" for the purpose of a mineral reservation. The ordinary and natural meaning of "mineral"— as it is used in the context of a general mineral reservation and mineral transactions— involves resources such as hard compounds, oil, or gas, mined as a raw material, to be used for further processing, refinement, and economic exploitation. Although a material's mineral content may render the material rare and valuable, and therefore within the ordinary and natural meaning of "mineral," dinosaur fossils are not considered rare and valuable because of their mineral properties; rather, fossils are valuable because of characteristics other than mineral composition. Finally, dinosaur fossils' relation to the surface, and the effect their removal has on the value of the surface estate, is the final factor in determining dinosaur fossils to be outside the ordinary and natural meaning of "mineral," as that term was used in the Murray-BEJ mineral deed. We decline to stretch the term "mineral" so far outside its ordinary meaning as to include dinosaur fossils.

/S/ LAURIE McKINNON

---

[11] The purchase agreement between the parties lists the purchase price for the property conveyed at $1,736,991.00, paid by the Murrays at the closing date, July 1, 2005.

28

We concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon, concurring.

¶42    I write separately to note that a supplementary interpretive device might aid future courts faced with ascertaining the "ordinary and natural meaning" of a term where the parties' intentions are otherwise unclear.   The divergent conclusions reached by the *Murray I* and *Murray II* courts using the same dictionary and statutory definitions of "mineral" evidences, in my opinion, that resort to these definitions as the sole authority for ascertaining the parties' intended meaning unnecessarily impedes arrival at the true intended meaning of a term.   Instead, the search for the "ordinary and natural meaning" of "mineral" might have been informed by the accompanying use of an arguably more transparent and reliable linguistic search tool.

¶43    Before discussing this linguistic tool, it is helpful to point out differences in the analytical methods employed by the *Murray I* and *Murray II* courts in arriving at the parties' intention.  The main point of divergence between the courts involved the import of dictionary and statutory definitions to determine the ordinary and natural meaning of "minerals," as that term was used in the mineral deed between the Murrays and BEJ. Instead of focusing on a singular definition of "mineral," *Murray I* compared numerous dictionary, statutory, and regulatory definitions to surmise that most definitions of "mineral" largely "focus on the mining of hard substances or oil and gas that are primarily

29

extracted for future refinement and economic purposes" and would therefore not include

dinosaur fossils. *Murray I*, 187 F. Supp. 3d at 1211. Following the guidance of the

*Heinatz* court, *Murray I* did not examine those senses[1] of the term "mineral" that focus on

its scientific, technical use; as fossils' inclusion in those senses gives little indication of the

intention of the contracting parties who are "presumed to have been familiar with the

ordinary and natural meaning of the words," and not the scientific or technical meaning.

*Heinatz*, 217 S.W.2d at 997.

¶44    In contrast, *Murray II* began its review by partitioning the dictionary definitions of

"mineral" into two categories: those broader definitions that focus on a substance's

scientific chemical composition; and those "more narrow" use-related definitions that

focus on the manner in which a substance is used, as opposed to its chemical composition.

*Murray II*, 908 F.3d at 442-43. In *Murray II*, the court observed "the majority of the

statutes and regulations the Murrays cite *do* encompass fossils in their definition of

'minerals.'" *Murray II*, 908 F.3d at 445 (emphasis in original). The *Murray II* court

disagreed with *Murray I*'s method of surveying definitions from multiple sources and

forming a synopsis of what those definitions are generally understood to include. The

*Murray II* court methodically distinguished each statutory, dictionary, and regulatory

definition considered significant to the court in *Murray I*, to conclude those definitions

---

[1] "Sense," in addition to referring to the faculty of perceiving by means of sensory organs, also refers to a conveyed or intended meaning of a word or the word's import or signification. A word's "sense" is significant to linguistic interpretation.

30

were severally "contradictory and therefore inconclusive." *Murray II*, 908 F.3d at 445, 446 n. 9.

¶45 These alternative conclusions, each premised in part upon dictionary definitions to ascertain the ordinary and natural meaning of a word, demonstrate dependency on such authority may be less reliable than convention holds. In this case alone the courts in *Murray I* and *Murray II* each turned to dictionary definitions, in years past referred to as "the last resort of the baffled judge," and reached opposite conclusions as to the ordinary and natural meaning of "mineral." *Jordan v. De George*, 341 U.S. 223, 234, 71 S. Ct. 703, 709 (1951) (Jackson, J., dissenting).

¶46 Several problems arise concerning the proper use of a dictionary's information that should be discussed at the outset.[2] First, courts often misuse a dictionary's practice of numerically listing senses in a term's definition, by assuming that this list is the dictionary's

---

[2] Scholarly articles studying courts' use of dictionary definitions to derive clear meaning in statutory interpretation have stated:

> [C]iting to dictionaries creates a sort of optical illusion, conveying the existence of certainty—or "plainness"—when appearance may be all there is. Lexicographers define words with words. Words in the definition are defined by more words, as are those words. The trail may be endless; sometimes, it is circular. Using a dictionary definition simply pushes the problem back.

A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 72 (1994); *see also* Stephen C. Mouritsen, *The Dictionary Is Not a Fortress: Definitional Fallacies and a Corpus-Based Approach to Plain Meaning*, 2010 BYU L. Rev. 1915, 1916 ("Though such reverence for dictionaries is 'deeply embedded in our culture,' dictionaries are often inadequate objects of our devotion, and their compilation is a decidedly human endeavor." (internal citations omitted)).

way of assigning a structural hierarchy to those senses.[3]  However, such an assertion reflects a flawed understanding of the structure and manner in which dictionaries convey information.  In the instant case, the *Murray II* court deemed a definition relied upon by the *Murray I* court as "secondary," without any support for its ranking and in contravention of that dictionary's stated method of conveying senses of a term.  *See Webster's Third New International Dictionary* 17a (3d ed. 1981) ("The system of separating by numbers and letters reflects something of the semantic relationship between various senses of a word.  It is only a lexical convenience.  It does not evaluate senses or establish an enduring hierarchy of importance among them.  The best sense is the one that most aptly fits the context of an actual genuine utterance.").  This Court may have also succumbed to the mistaken assumption that a first-listed sense of a term assigns a certain relevancy, importance, or frequency of use to that sense over later-listed senses.  Courts relying on this false presumption often incorrectly use dictionaries' listing of senses as support for a preferred "common meaning."

¶47    Second, a dictionary's listed senses of a term is not an exclusive record of the contexts in which the term is presently used;[4] rather, "[i]n defining a given term, a dictionary merely presents a range of possible meanings and a record of several ways in

---

[3] *See, e.g.*, *Muscarello v. United States*, 524 U.S. 125, 118 S. Ct. 1911 (1998) (asserting that several dictionaries' first-listed sense of a term is the "primary" (i.e., most common) meaning, and professing later-listed senses to be "secondary" or "specialized" meanings).

[4] *See, e.g.*, *Oxford English Dictionary* xxiii (1971) ("[T]he circle of the English language has a well-defined centre but no discernable circumference.  Yet practical utility has some bounds, and a Dictionary has definite limits: the lexicographer must, like the naturalist, 'draw the line somewhere,' in each diverging direction.").

which the term has been employed in the past." Mouritsen, *supra* note 4, at 1924. Deeming one sense of a term appearing in multiple dictionary sources to be the most commonly understood meaning is a fallacious use of a dictionary's descriptive purpose.

¶48 Third, a dictionary's inclusion of one sense of a word does not automatically render that sense as within the term's ordinary and natural meaning. The *Murray II* court noted that "an older edition of *Black's Law Dictionary*" references fossils in one sense of "mineral" as support for its conclusion that "minerals" as used in the deed between the Murrays and BEJ encompassed dinosaur fossils. *Murray II*, 908 F.3d at 444. Seemingly, the *Murray II* court asserts that because the 6th Edition of *Black's Law Dictionary* included this sense, fossils must be included in the term's ordinary and natural meaning. However, that this sense of the term was once included in a definition of mineral merely confirms that at one point in time, use of "mineral" was *sometimes* thought to include fossils; but this fact hardly confirms that fossils are included in the term's *ordinary* meaning.[5] That a sense of the term has been deemed linguistically permissible does not render that sense to be the most common usage.

¶49 Here, the quest for the "ordinary and natural meaning" of "mineral" might have been informed by use of an arguably more transparent and reliable linguistic search tool. An electronic corpus containing a vast collection of written and spoken English would have assisted in ascertaining, with empirical evidence, whether the ordinary meaning of

---

[5] *See, e.g.*, *Smith v. United States*, 508 U.S. 223, 242, 113 S. Ct. 2050, 2061 (1993) (Scalia, J., dissenting) ("The Court does not appear to grasp the distinction between how a word *can be* used and how it *ordinarily is* used." (emphasis in original)).

33

"mineral" includes dinosaur fossils.[6]  The Corpus of Contemporary American English (COCA) is one such tool, useful for discovering "how particular words or phrases are actually used in written or spoken English."  *Rasabout*, 356 P.3d at 1275 (Lee, J., concurring in part, concurring in the judgment); *People v. Harris*, 885 N.W.2d 832, 838-39 (Mich. 2016).  COCA, available for free at https://www.english-corpora.org/coca/, allows the user to generate a list of the most common words (grouped by parts of speech, i.e., nouns, adjectives, verbs, and adverbs) used within four words of "mineral" in its database of over one billion words of text from eight genres.[7]  Those common words are referred to as the search term's "collocates."  As a COCA word search of "mineral" yields a list of uses of the term in the context of its collocates, the user can "assess the frequency of each of the attested meanings" of "mineral."  *Rasabout*, 356 P.3d at 1281.

¶50    The generated list of collocates alone gives some insight into the ordinary meaning of "mineral."[8]  The top noun collocates relevant here which appear within four words of the node word "mineral" are: *resource* (389 times); *oil* (378 times); *right* (302 times); and *deposit* (212 times).[9]  In contrast, the term "fossil" appears within four words of "mineral"

---

[6] "Most any analysis of public sources of real-world language . . . is better than a judge's take-my-word-for-it assertion of ordinariness."  *State v. Rasabout*, 356 P.3d 1258, 1279-80 (Utah 2015) (Lee, J., concurring in part, concurring in the judgment).
[7] Those genres include spoken word, fiction, popular magazines, newspapers, academic texts, television and movie subtitles, blogs, and other web pages.

[8] I should note that I agree with *Heinatz*'s reasoning that, since scientific and technical senses of mineral appear from the transacting document to be outside the context of the parties' contemplation, collocates of "mineral" used in scientific and technical contexts are unhelpful in making an "ordinary and natural" determination.  *Heinatz*, 217 S.W.2d at 997.

[9] The top acontextual noun collocates excluded were: *vitamin* (1,260 times); *water* (769 times); *bone* (369 times); *density* (223 times); and *rock* (212 times).  Although "bone" appears in the list,

69 times. The top contextually relevant verb collocates appearing within four words of "mineral" are: *extract* (71 times); and *mine* (64 times).[10] Examining those instances in which "mineral" appears near these collocated nouns and verbs confirms the *Murray I* court's characterization of the ordinary and natural meaning of "minerals" as used in the context of the Murray-BEJ mineral deed: "the common understanding of 'mineral' includes the mining of a hard compound or oil and gas for refinement and economic exploitation." *Murray I*, 187 F. Supp. 3d at 1212.

¶51    Of the 389 times the node word "mineral" and its collocate "resource" appear together, the context is overwhelmingly in reference to economics and extraction of resources, together with the concomitant boom and bust cycle and Gross Domestic Product fluctuations those nations holding "mineral resources" sometimes experience. "Oil" was also most used with "mineral" in the context of economics, nonrenewable resources, and extraction and exploitation, as was the collocate "right." Use of "deposit" near "minerals" outside of the scientific context occurred in reference to the presence, size, and type of a mineral deposit, as size and type of the deposit are the controlling factors in determining whether extraction is economically feasible. The relevant verb collocates provided a similar understanding of the ordinary and natural meaning of "mineral" as used in mineral conveyances. For instance, the collocate "extract" appearing near "mineral" largely

---

running a concordance search of the ways "bone" and "mineral" are used together reveals that the words are most commonly used in the context of "bone mineral density" in medical research and information.

[10] Those verb collocates that were excluded for irrelevance of contextual use were: *contain* (222 times); *form* (118 times); and *trace* (74 times).

involved industry removal of oil, gas, and mineral resources for economic use or further refinement.

¶52 All of this linguistic data supports the *Murray I* court's holding that, where an agreement reserves the "oil, gas, hydrocarbons, and minerals in, on and under, and that may be produced from the [property]," dinosaur fossils would not ordinarily be understood as included in this reservation. Dinosaur fossils are not commonly thought of as mineral resources in the way that term is ordinarily used in a mineral deed.

¶53 Notwithstanding this seemingly transparent and reliable linguistic tool, the Court reaches its decision today without relying upon COCA. Neither party utilized corpus linguistics to advance their arguments; therefore, it would be inappropriate to use corpus linguistics as support for our holding. Montana courts use, and will continue to use, dictionary definitions to assist in determining the common and ordinary understanding of a contract term where the parties' intention is otherwise unclear. *See, e.g.*, *DollarPlus Stores, Inc. v. R-Mont. Assocs., L.P.*, 2009 MT 164, ¶¶ 18-20, 350 Mont. 476, 209 P.3d 216. Nonetheless, given the contrary conclusions reached in *Murray I* and *Murray II*, where both courts utilized dictionary sources to ascertain the natural and ordinary meaning of minerals, I wonder if this supplementary linguistic search tool would have informed the inquiry of whether the "ordinary and natural meaning" of "minerals" includes fossilized dinosaurs.

/S/ LAURIE McKINNON

36

Justice Ingrid Gustafson, dissenting.

¶54    I dissent.  Applying our clear, well-settled precedent from *Farley* and *Hart*, I would conclude the dinosaur fossils at issue here constitute "minerals" for the purpose of the mineral reservation in the deed.

¶55    Although the Ninth Circuit did not frame the question to ask whether "these" dinosaur fossils were included in "this" mineral reservation, that does not mean the Circuit Court sought a broad inquiry into and definitive analysis of what mineral reservations mean for all purposes or how deeds should be drafted.  Here, especially in light of the 2019 Legislature's adoption of H.B. 229,[1] the issue is whether the dinosaur fossils in this instance constitute "minerals" for the purpose of the mineral reservation in the deed between Murrays and BEJ and it is therefore unnecessary for this Court to opine further with regard to the status of all dinosaur fossils.  Indeed, our precedent reveals that the analysis requires fact-specific consideration.  Thus, I would reframe the question accordingly: "Whether, under Montana law, these dinosaur fossils constitute 'minerals' for the purpose of a mineral reservation?"  The answer to that question, applying *Farley* and *Hart*, is "yes."

¶56    *Farley*, followed by *Hart*, implicitly set forth a 2-prong test for determining whether a substance is a "mineral" for purposes of a mineral reservation: (1) whether minerals comprise the substance at issue, and if so, (2) is the substance rare and exceptional in

---

[1] H.B. 229, adopted by the Montana legislature in 2019, determined that going forward dinosaur fossils are part of the surface estate, such that any reservation thereof would be required to be specifically stated in the deed.

37

character or does it possess a peculiar property giving it special value. In *Farley*, we were

called to determine whether the scoria at issue was a "mineral" for the purposes of a mineral

reservation. We noted, "[t]he term 'mineral' has been the source of considerable confusion

in mineral law litigation nationwide . . . 'The courts which have held that the general

reservation of "all minerals" is inherently ambiguous have traveled over a long and tortuous

path in a complex and hopeless search to discover the particular minerals the parties

intended to reserve.'" *Farley*, 270 Mont. at 5, 890 P.2d at 379 (quoting *Miller Land &*

*Mineral v. State Highway Comm'n*, 757 P.2d 1001, 1002 (Wyo. 1988)). Presumably to

reduce ongoing confusion, relying on the reasoning of *Heinatz*, this Court followed the

*Heinatz* 2-prong test to determine whether the scoria was a mineral for purposes of a

mineral reservation. The dinosaur fossils here, like the scoria in *Farley*, have a 100%

mineral composition. After reviewing statutory definitions and case law from other

jurisdictions, including *Heinatz*, we held scoria was not a mineral because it was not "rare

and exceptional in character" and was "used in road construction." *Farley*, 270 Mont. at

7-8, 890 P.2d at 380-81 (citations omitted). Later, in *Hart*, we were called to determine

whether sandstone, a 100% mineral composition, was a mineral for the purposes of a

mineral reservation. In applying the *Farley* analysis, we noted again we were using the

reasoning of *Heinatz*:

> In our opinion substances such as sand, gravel and limestone are not minerals
> within the ordinary and natural meaning of the word *unless they are rare and*
> *exceptional in character or possess a peculiar property giving them special*
> *value*, as for example sand that is valuable for making glass and limestone of
> such quality that it may profitably be manufactured into cement. Such
> substances, when they are useful only for building and road-making purposes,

38

are not regarded as minerals in the ordinary and generally accepted meaning of the word.

*Hart*, ¶ 6 (emphasis added) (citing *Heinatz*, 217 S.W.2d at 997). As we did in *Farley*, we then applied the *Heinatz* test to the sandstone at issue and found it was "not exceptionally rare and valuable" and therefore, was not a mineral for the purposes of a mineral reservation. *Hart*, ¶ 7. Using this same test, it is clear that the dinosaur fossils at issue in the present case are minerals for the purposes of the mineral reservation in the 2005 deed. Under the first prong, the parties agree that minerals make up 100% of the fossils' composition. Proceeding to the second prong, it is undisputed "they are rare and exceptional in character or possess a peculiar property giving them special value." *See Heinatz*, 217 S.W.2d at 997. As they meet both prongs of the *Farley* test, they would be considered minerals for purposes of the mineral reservation. The Court today, however, does not use the test as we did in *Farley* and *Hart*, and instead creates a new, more convoluted, three-part test which bears little resemblance to *Farley*, *Hart*, or *Heinatz*.

¶57 "In answering a certified question of law, we interpret the law as applied to the agreed facts underlying the action." *High Country Paving, Inc. v. United Fire & Cas. Co.*, 2019 MT 297, ¶ 11, 398 Mont. 191, 454 P.3d 1210 (internal quotations and citation omitted). In its Certification Order, the Ninth Circuit attached as an appendix the *Murray I* and *Murray II* decisions, which the Court relied upon in its Factual and Procedural Background. Left out of the Court's Factual and Procedural Background is the important fact that it is undisputed the dinosaur fossils at issue in this case are entirely minerals. *See Murray I*, 187 F. Supp. 3d at 1206-07; *Murray II*, 908 F.3d at 442 ("In this case, for

39

example, the parties do not dispute that the Montana Fossils *are* minerals in a scientific sense, as they are composed entirely of the minerals hydroxylapatite and/or francolite."). I would—as is proper under our standard of review for answering a certified question— simply recognize the agreed fact these dinosaur fossils are scientifically minerals. *High Country Paving*, ¶ 11.

¶58 The Court today does not appear to recognize that a substance which is scientifically a mineral is in fact a mineral substance, instead choosing to search through Montana statutes and regulations, along with an administrative decision made by the Department of the Interior over a century ago to determine that "minerals and fossils are mutually exclusive terms under Montana law." Opinion, ¶ 25. Such a declaration is undermined by the very first source the Opinion cites, § 82-4-303(16), MCA, which defines mineral as: "any ore, rock, or substance . . . that is taken from below the surface or from the surface of the earth for . . . other subsequent use[.]" The dinosaur fossils at issue in this case are mineral substances, taken from below or on the surface of the earth, for subsequent use— primarily as museum exhibits or artifacts that otherwise could be displayed for profit. The dinosaur fossils are therefore "minerals" under § 82-4-303(16), MCA. Not cited by the Court, but no less relevant when recounting the myriad statutory definitions, is the definition of mineral found in § 15-38-103(3), MCA, which defines "mineral" to include, among other things, "nonrenewable merchantable products extracted from the surface or subsurface of the state of Montana." The fossils at issue here are nonrenewable, merchantable products, and they were extracted from the subsurface of Montana. *See Murray II*, 908 F.3d at 445-46, n.9.

¶59    The second source the Court cites for its contention that fossils and minerals are mutually exclusive terms defines mineral to mean, among other things, "any other substance defined as a mineral by the law of this state." Section 70-9-802(9), MCA. The dinosaur fossils would also be "minerals" under this statute, as they meet the §§ 82-4-303(16) and 15-38-103(3), MCA, definitions of mineral, but also, and more importantly, the definition of "mineral" when following this Court's precedence of *Farley* and *Hart*.

¶60    In *Farley*, we recognized "that the definition of 'mineral' can differ according to the context in which it is used." *Farley*, 270 Mont. at 6, 890 P.2d at 379. We further noted "the term 'mineral[]' has varying definitions in different contexts." *Farley*, 270 Mont. at 6, 890 P.2d at 379. The same principle should guide the Court today. Rather than simply declare "fossils" to be mutually exclusive from "minerals" based upon statutory definitions —some of which actually support the definition of fossils as minerals—the Court should accept the undisputed fact that these fossils are scientifically minerals, recognize that the definition of mineral can differ according to the context in which it is used, and move on to the second part of the *Farley* test.

¶61    Rather than simply accept that these dinosaur fossils, composed entirely of minerals, are in fact minerals, and then determine if "they are rare and exceptional in character or possess a peculiar property giving them special value," the Court creates a convoluted and circular test to determine the fossils are not minerals because the deed reserved "minerals" rather than "dinosaur fossils" and the parties could have reserved dinosaur fossils in the deed. *See Heinatz*, 217 S.W.2d at 997; Opinion, ¶ 31. The Court arrives at this conclusion despite the Ninth Circuit, in its Certification Order, specifically noting that the parties did

41

not contemplate the possible existence of dinosaur fossils at the time of the 2005 deed and the Court—in this very opinion—writing that "neither the Murrays nor the Seversons: (1) suspected that there were valuable dinosaur fossils on the property; (2) considered whether dinosaur fossils would be included in the mineral estate as defined in their 2005 mineral deed; or (3) expressed any specific intent about who would be entitled to ownership of any dinosaur fossils found on the property." Opinion, ¶ 6. Rather than use the plain, ordinary reading of "minerals" as the catch-all for mineral substances not thought of by the parties at the time, the Court whittles its meaning in the deed down to nothingness by finding the failure to affirmatively, and prospectively, list a substance which is 100% composed of minerals in a mineral reservation somehow means that substance is now not a mineral.

¶62 The Court further opines that "the mineral properties of dinosaur fossils . . . are not what makes them valuable for production from the property, such as oil, gas, hydrocarbons, or other traditional minerals." Opinion, ¶ 31. A "traditional mineral" is not defined in the Court's opinion today. Is scoria a "traditional" mineral? Is sandstone? Under the facts presented in those cases, we determined that neither is a "mineral" for the purposes of a mineral reservation using the two-part *Heinatz* test. *Farley*, 270 Mont. at 8, 890 P.2d at 381; *Hart*, ¶ 8. Would they even make it to the second prong of the Court's new test? A diamond is a mineral. It is also simply carbon. *CRC Handbook of Chemistry and Physics* 4-8 (96th ed. 2015); *see also Collins*, 2013 U.S. Dist. LEXIS 15749, at *3 ("Diamond is composed of carbon atoms."). Diamonds are valuable because they are considered to be

42

rare and exceptional, not because they are carbon.[2]  Tethering value to the definition of mineral based on its mineral properties makes little sense, particularly when the tests used in *Farley*, *Hart*, and *Heinatz* contain a second prong to determine whether something which is a mineral substance—again, it is undisputed in this case the dinosaur fossils are scientifically minerals—is a "mineral" due to its rare, exceptional, and/or valuable character.

¶63     After a tortuous path to determine that these dinosaur fossils composed entirely of minerals are not minerals due to their composition, the Court turns to the rare and exceptional prong of the mineral test from *Farley* and *Hart*.  Instead of using that prong, however, the Court creates an entirely new one which "asks whether the mineral content of the material in question renders it 'rare and valuable.'"  Opinion, ¶ 33.  This new test asks whether the substance is rare and valuable because of its mineral composition, not whether the substance is rare and valuable.  As addressed in the example of the diamond above, such an approach simply invites confusion to what was once a relatively straightforward analysis.  Because these fossils are entirely made of hydroxylapatite and/or francolite, which are not necessarily rare and valuable on their own, the Court declares that

---

[2] The Opinion asserts diamonds are valuable because of their mineral composition—"bonding between the carbon atoms that make up [the] minerals."  Opinion, ¶ 35, n.10.  But only about 50% of diamonds are thought to be high enough quality to be sold on the diamond market despite their "bonding between the carbon atoms."  Much like some dinosaur fossils are relatively worthless "junkosaurs" while others are worth millions of dollars, some diamonds have very little value despite having the same mineral composition as more valuable diamonds.  Just like dinosaur fossils, it is not their mineral composition alone that makes them rare and valuable.  Determination of what is rare and valuable is influenced by several factors which have little or nothing to do with mineral composition.

the fossils are not rare and valuable due to their mineral composition while at the same time admitting the fossils are indeed rare and valuable because they are exceptional specimens of fossils. Opinion, ¶ 35. Though the Court cites to *Heinatz* for this contention, *Heinatz* quite clearly speaks to the rare and exceptional qualities of the *substance*, not its mineral composition. *Heinatz*, 217 S.W.2d at 997. The *substance* at issue here is a dinosaur fossil, not hydroxylapatite and/or francolite. Under the *Heinatz* test, which we used in both *Farley* and *Hart*, it is abundantly clear these fossils are rare, exceptional, and valuable.

¶64 Because the fossils are composed entirely of minerals, as well as rare and valuable, they are "minerals" for the purposes of the 2005 mineral reservation deed under our precedent in *Farley* and *Hart*. Rather than using the two-pronged *Farley* and *Hart* test, however, the Court grafts on a third prong—"relation to and effect on the surface"— flowing from an expanded reading of *Heinatz*. This third prong was not adopted into Montana law by either *Farley* or *Hart*, both of which relied on *Heinatz*. Both *Farley* and *Hart* simply determined whether a substance—scoria and sandstone, respectively—was a mineral substance and then whether it was rare and valuable to determine whether the substances were "minerals" for purpose of a mineral reservation. Neither case considered the relationship of the mineral substances to the surface when determining whether the substances were "minerals." Further, the deed in this case provided for the parties to own, as tenants in common:

> all right title and interest in and to all of the oil, gas, hydrocarbons, and minerals *in, on and under*, and that may be produced from the [property] . . . together with the right, if any, to ingress and egress at all times for the

> purpose of mining, drilling, exploring, operating, and developing said lands for oil, gas, hydrocarbons, and minerals, and storing, handling, transporting, and marketing the same therefrom together with the rights to remove from said lands all of Grantors' property and improvements. [(Emphasis added.)]

The language of the deed in this case clearly does not require surface disturbance to be minimal and temporary in order for a substance to be included in a mineral reservation. Indeed, by its plain language, the deed in this case contemplated the possibility of valuable minerals existing "on" the surface. Expanding the mineral test beyond what this Court stated in *Farley* and *Hart* to include considerations of the surface is unwarranted, unnecessary, and will only serve to create further inconsistency and confusion which is at odds with the Opinion's stated goal to create "a reliable and consistent construction of what a general mineral reservation is thought to contain[.]" Opinion, ¶ 13. How deep is the surface estate—5', 10', 100'? What if the mineral extends both below the surface (whatever depth that is ultimately defined as) as well as above the surface estate—will the part extending below be a mineral and the part above not a mineral? Will the surface estate be defined only as depth or defined as acreage consumed in the extraction?

¶65 Before the Court's decision today, Montana law was clear in its two-pronged test set forth in *Farley* and *Hart*: (1) is the substance a mineral and, if so, (2) is the substance rare, exceptional, and/or valuable. If the substance met both prongs, it was considered a mineral under Montana law. The dinosaur fossils at issue in the present case meet both prongs and therefore are minerals pursuant to *Farley* and *Hart*. Prior to the Court's decision today, Montanans had clear guidance on what a mineral reservation actually reserved, and any other mineral reservation questions could be determined by applying

45

*Farley* and *Hart*. Under that precedent, the dinosaur fossils in this case were reserved. The Court has today upended this simple and clear guidance.[3] To reach such a result, the Court crafts a new, convoluted, and opaque three-factor test that will spawn more questions than it answers. Especially when presented in a case with such limited application, I believe it is a mistake to replace clear law with confusing law, and I respectfully dissent.

/S/ INGRID GUSTAFSON

Justice Beth Baker and Judge Rieger join in the dissenting Opinion of Justice Gustafson.

/S/ BETH BAKER
/S/OLIVIA RIEGER
Judge Rieger
Sitting for Justice Jim Rice

---

[3] While the Legislature may have eliminated application of the *Farley* test as it applies to dinosaur fossils, but for today's decision, the test would continue to provide clear guidance as to other minerals in the future.